UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINA NELMS,

     Plaintiff,

v.

LENAWEE COUNTY et al.,

     Defendants.

Case No. 21-10917
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING
LENAWEE COUNTY'S MOTION TO DISMISS [23]**

---

Daniel Smith, Christina Nelms' father, entered Lenawee County Jail on August 31, 2018, where he was being housed following arrest. Smith had a history of a few chronic conditions, like high blood pressure. And while he was at the jail, Smith saw Rhonda Miller, LPN, and Daryl Parker, MD, two employees of Wellpath, LLC, for high blood pressure, chest pain, and shortness of breath. Unfortunately, two months later, on October 29, Smith suffered a heart attack and passed away.

Nelms, as Smith's personal representative, alleges that Lenawee County, as well as Wellpath and the medical professionals responsible for treating Smith, were deliberately indifferent to Smith's serious medical needs, leading to his death. Specifically, Nelms says Smith's death was a result of the County and Wellpath's policies or customs for providing medical care to those housed at the jail as well as their failure to create certain policies and guidelines for providing adequate medical

care. The County moves to dismiss the claim against it. For the reasons provided below, the County's motion to dismiss is GRANTED.

## I. Background

### A.

Because the County seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the factual allegations in Nelms' complaint as true and draws reasonable inferences from those allegations in Nelms' favor. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

In August 2018, Smith was booked into the Lenawee County Jail for failing to make a court appearance. (PageID.5.)[1] He had a number of chronic conditions, including hypertension, hepatitis C, chronic obstructive pulmonary disease, and heroin addiction. (*Id.*) And for his first few days at the jail, Smith was under supervision for heroin withdrawal. (PageID.6.)

During his time at the jail, Smith saw the jail's medical doctor, Daryl Parker, a few times. (*Id.*) Parker is an employee of Wellpath, which is under contract with the County to provide medical care to those housed at the county jail. (PageID.4–5.) Smith saw Parker three times: on September 7, where Smith presented with abnormal blood pressure readings and Parker prescribed blood pressure medication; on September 9 for chest pain; and on September 14, when Parker prescribed an increase in blood pressure medication. (PageID.6.) Despite these visits, Nelms says Parker did not order EKG testing, screening for coronary artery disease, or a

---

[1] All record citations are to ECF No. 1, unless otherwise indicated.

treadmill stress test, and did not request Smith's medical records from Veterans Affairs. Smith also was seen by Rhonda Miller, a licensed practical nurse (LPN) that works for Wellpath, for shortness of breath and chest pain. (PageID.5, 7.) The Court notes that a licensed practical nurse is different from a registered nurse, and the position requires less years of formal education.

Smith's health began to deteriorate on October 29, 2018, about two months after he was booked into the jail. (PageID.7.) That afternoon, a correctional officer asked Miller to check on Smith because he observed labored breathing, but Miller declined to do so and said to contact her if Smith's breathing got worse. (*Id.*) About an hour and a half later, the same correctional officer contacted Miller and told her that Smith "wasn't doing so good." (PageID.8.) Miller checked Smith's oxygen levels and provided him an inhaler. (*Id.*) She did not check his vital signs. (*Id.*)

Three hours passed. Another correctional officer contacted Miller again "about Smith feeling weak." (*Id.*) Miller did not assess Smith at this time, nor did she take his vital signs or contact a physician or nurse supervisor. (PageID.9.)

Two hours later, at around 10:45 p.m., a correctional officer again contacted Miller because Smith "appeared to be restless and uncomfortable[.]" (*Id.*) Miller noted that Smith's blood pressure was 40 systolic (the top number), but she was unable to obtain Smith's diastolic blood pressure (the bottom number) or obtain a pulse oximeter reading. (*Id.*) Smith's pulse was at 52 bpm. (*Id.*) Miller asked a correctional officer to call an ambulance. (*Id.*) Nelms states that Miller did not provide Smith oxygen or conduct CPR or other resuscitation efforts while waiting for the ambulance

3

to arrive. (*Id.*) In all, it is alleged that Smith had difficulty breathing for over six hours before an ambulance was called.

Unfortunately, within an hour of being transported to the hospital, Smith died. (PageID.10.) The autopsy concluded that his death was a result of an acute myocardial infarction, commonly known as a heart attack. (*See id.*)

## B.

In time, Nelms, who was appointed the personal representative of Smith's estate, brought suit. (ECF No. 1.) After this Court declined supplemental jurisdiction over some of the state law claims (ECF No. 44), the following claims remain: a § 1983 claim against Miller, Parker, Wellpath, and Lenawee County alleging violation of the Fourteenth Amendment's protection against deliberate indifference to a pretrial detainee's serious medical needs (Count I) and a wrongful death claim under Michigan law (Count II). (PageID.14–22.) Nelms clarifies in her response that Count II was not brought against the County. (ECF No. 32, PageID.729.)

Specifically, Nelms brings a *Monell* claim against the County alleging that its policies, procedures, and practices relating to medical care of those housed in the Lenawee County jail are constitutionally deficient under the Fourteenth Amendment. Nelms alleges several policies (or lack of policies) that form the basis of this claim, including staffing the jail with "underqualified" LPNs, providing cursory care to those with chronic conditions based on budgetary concerns, providing inadequate access to physicians, not providing LPN training programs on caring for those with chronic conditions, relying on LPNs as gatekeepers to physicians, not

4

implementing a quality assurance program, not providing postmortem mortality reviews after a pre-trial detainee dies, not providing policies on timeliness of access to medical care, making healthcare decisions based on budgetary concerns, and capping costs of services rendered outside the facility. (PageID.16–17.) All of these policies (or lack of policies) are alleged against both the County and Wellpath.[2] (*Id.*)

The County's motion to dismiss the *Monell* claim is now before the Court. (ECF No. 23.) The parties' positions are briefed adequately, and the motions can be decided without further argument. *See* E.D. Mich. LR 7.1(f).

## II. Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable" to Nelms and determines whether her "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Detailed factual allegations are not required to survive a motion to dismiss, *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012), but they must "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S.

---

[2] The Court notes that a municipality can only be held liable for "conduct properly attributable" to it. *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 386 (6th Cir. 2018). In other words, there is no respondeat superior liability for municipalities. *Id.* Nelms does not identify what conduct is attributable to the County as opposed to Wellpath. Nevertheless, the Court will proceed to consider this motion as if all of Nelms' policy-related allegations are alleged to be the official policy or custom of the County.

544, 555 (2007). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### III. Individual Violation

The Court will first address the threshold issue of whether Nelms must have alleged that County jail personnel committed a constitutional violation to pursue a claim against the County itself. It is undisputed that the only individual defendants remaining in Nelms' complaint are Parker and Miller, both of whom are employees of Wellpath. Nelms does not sue any jail personnel and does not allege any wrongdoing by any County agents. The County argues that a municipality cannot be held liable for authorizing unconstitutional behavior if no municipal officer has committed a constitutional violation.

A summary of Sixth Circuit case law on this point is warranted. In *Watkins v. City of Battle Creek*, the Sixth Circuit held that if "no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." 273 F.3d 682, 687 (6th Cir. 2001). The reasoning behind this broad rule is that to proceed with a § 1983 claim, a plaintiff must show a deprivation of a constitutional or federal right caused by a person acting under the color of state law. *See Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015). Generally, if no constitutional violation can be attributed to an individual municipal actor, it is unlikely that the plaintiff was deprived of a constitutional right at all. *See North*, 754 F. App'x at 390.  But more recently, the Sixth Circuit has recognized that "in certain unusual circumstances, a municipality might be liable for a constitutional violation

6

even in the absence of a liable individual." *Hart v. Hillsdale Cnty., Michigan*, 973 F.3d 627, 645 (6th Cir. 2020). One of the circumstances that may fall into this exception is a claim "premised on failure to act rather than affirmative wrongdoing." *North*, 754 F. App'x at 390.

Here, just as in *North*, Nelms brings claims based on both the County's affirmative policies or customs and a failure-to-train claim. So, as the Sixth Circuit did in *North*, this Court finds that Nelms' allegations "might fit" within the exception to the individual violation rule, and will assume, without deciding, it does for the purposes of this motion. *See* 754 F. App'x at 390; *see also Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 582 (6th Cir. 2020) (declining to decide whether plaintiff needed to show an individual constitutional violation because plaintiff failed to establish that he suffered a constitutional violation attributable to the municipality); *Winkler v. Madison Cnty.*, 893 F.3d 877, 901 (6th Cir. 2018) (assuming, without deciding, that municipal liability is not always contingent on a finding of liability for an individual defendant). The Court makes this assumption because, even with the benefit of it, Nelms cannot prevail.

But because Nelms has not alleged that any jail employee violated Smith's Fourteenth Amendment rights, Nelms must plausibly allege that the County, through its policies and customs, violated Smith's rights by "manifesting deliberate indifference to his serious medical needs." *See North*, 754 F. App'x at 391 ("Here, however, because North has not demonstrated that any individual jail employee violated his Eighth Amendment right to adequate medical care by acting with

deliberate indifference, he must show that the municipality itself, through its acts, policies, or customs, violated his Eighth Amendment rights by manifesting deliberate indifference to his serious medical needs.").  In other words, the County must have acted in a way that was deliberately indifferent to Smith's medical needs for Nelms' claim against it to survive. With this framework in place, the Court will go on to consider Nelms' *Monell* claims against the County.

## IV. Monell Claims

Local governments cannot be sued under § 1983 based solely on injuries inflicted by their employees or agents. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *see also North v. Cuyahoga Cnty.*, 754 F. App'x 380, 386 (6th Cir. 2018). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Plaintiffs can make this showing in four ways: "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Winkler v. Madison Cnty.*, 893 F.3d 877, 901 (6th Cir. 2018).

Nelms' *Monell* claim falls into three of the above categories: the County's official policies, the County's custom of tolerance or acquiescence of federal violations, and the County's policy of inadequate training or supervision. The Court will address each theory in turn.

A.

To pursue a claim against the County based on its policies or customs, Nelms must plausibly "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [the] particular injuri[ies] w[ere] incurred due to execution of that policy." *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 598 (6th Cir. 2021). And, as explained above, because Nelms does not allege that an individual county actor committed an underlying constitutional violation, she must also allege facts that show that the County, via its policies or customs, was deliberately indifferent to Smith's serious medical need. *See North*, 754 F. App'x at 391 ("In other words, deliberate indifference is relevant to North's policy-based *Monell* claim because it is necessary to our determination of whether North suffered an Eighth Amendment injury.").

1.

The Court starts with whether the alleged County policies amount to deliberate indifference toward Smith's medical needs. In other words, has Nelms plausibly pled a constitutional violation attributable to the County?

Because this case involves a pretrial detainee, it is governed by the Fourteenth Amendment. Recently, the Sixth Circuit clarified that the deliberate-indifference standard that applies to pretrial detainees is different from the deliberate-indifference standard that governs convicted prisoners under the Eighth Amendment. *See Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 596 (6th Cir. 2021). "What then is required to establish deliberate indifference in this context? Mere

9

negligence is insufficient. A defendant must have not only acted deliberately (not accidentally), but also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (internal citations omitted). The *Brawner* opinion does not apply this deliberate-indifference standard directly to the municipality's policies or customs because it found sufficient evidence that an individual county actor violated Brawner's constitutional rights. *Id.* at 597. So it is unclear if the *Brawner* standard also applies to municipalities. Given the Court's reasoning in *North*, however, that there must be a showing that "the municipality itself, through its acts, policies, or customs, violated [plaintiff's rights] by manifesting deliberate indifference to his serious medical needs," 754 F. App'x at 391, and the *Brawner* Court's clarification of what deliberate indifference means in the pretrial context, the Court proceeds by analyzing Nelms' claims based on the *Brawner* standard. In their briefing, the parties do not discuss *Brawner* or its application to the County. Thus, neither party provides argument that the Court should not use the *Brawner* standard in deciding whether Nelms has plausibly pled that the County acted in violation of the constitution through its policies.

The Sixth Circuit has also held that, in the context of municipal liability, "[t]his in turn typically requires proof," or here, factual allegations, "that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).

Nelms has not, however, adequately pled that the County was "aware of prior unconstitutional actions" prompted by its policies yet "failed to take corrective

10

measures." It is true that Nelms has identified five other incidents of medical issues at the Lenawee County Jail. (ECF No. 1, PageID.18–19.) But all these incidents occurred prior to 2009, and most occurred in 2007. (*Id.*) And none are alleged to involve pretrial detainees who died of a heart attack. These allegedly unconstitutional actions that occurred more than a decade before this lawsuit was filed do not plausibly allege that the County ignored a known or obvious consequence of any of its current jail medical policies. The County cannot "know" of an "unjustifiably high risk of harm" when it has operated the jail for a decade and no such risk has manifested. Further, even if the timing of the other allegedly unconstitutional actions was not an issue, Nelms has not adequately pled that the County failed to address these issues in the last decade. So without alleging any recent incidents, Nelms cannot rely on the typical route of pointing to prior unconstitutional actions to show that the County was deliberately indifferent. And, after taking a closer look at each of the policy failures Nelms alleges, the Court finds that none plausibly form the basis of a deliberate-indifference claim.

Take Nelms' allegation that Smith's injury was caused by the County's policy of staffing jails "primarily with medically underqualified LPNs" without doctor or RN supervision and by the policy of using LPNs as "gatekeeper[s]" to physicians. The Sixth Circuit rejected a similar theory in *Graham. See Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). The Sixth Circuit clarified that contracting out a jail's medical services and leaving such care in part to LPNs is not a constitutional violation. *Id.* at 384. So by asserting that the County's

use of "unqualified" LPNs resulted in the deprivation of Smith's constitutional rights, Nelms is essentially arguing that "the County's policy did not, in this particular case, adequately address [Smith's] specific medical needs." *See id.* But "[t]he fact that alternative procedures might have better addressed [a detainee's] particular needs does not show that the [County was] deliberately indifferent to his medical needs." *Id.* Thus, Nelms cannot plausibly allege a constitutional violation based on the County's policy of staffing its jail with LPNs.

Next consider Nelms' budget-related theories, where she alleges that the County has a policy of "providing cursory care" and "making health care decisions, including, but not limited to, LPN staffing decisions" based on budgetary concerns. The County does not intentionally disregard or ignore Smith's medical needs merely because it considers the budget when making healthcare decisions. And even if the County's policy were to pick the cheapest healthcare option for each pre-trial detainee, that does not plausibly allege that it is *indifferent* to their needs. To do that, Nelms must plausibly have pled that the County's cost-cutting violated Smith's 14th Amendment right to medical care. But there are no factual allegations that, if true, would show that, in an effort to provide the most cost-effective health care, decisions were made in Smith's case to deny him certain treatment. Further, Nelms does not allege that the overall budget is so inadequate that there is a very high risk of serious needs being unmet. Nelms specifically alleges that "cursory care" is provided for chronic conditions "based upon budgetary concerns" (PageID.16), that the County makes "health care decisions, including, but not limited to LPN staffing decisions

12

based on budgetary concerns over inmate safety" (PageID.17), and that the contract between the County and Wellpath creates a "financial incentive to delay inmate referral for hospitalization based upon budgetary concerns" (*id*). None of these allegations relate to the budget as a whole. They merely allege that certain decisions are made "based on budgetary concerns," which is insufficient to show deliberate indifference under the Fourteenth Amendment.

Nelms also alleges that the County has a custom or policy of "understaff[ing] jails" by having a physician onsite at Lenawee County Jail only "1.5 - 3 hours per week." (PageID.16.) To proceed, Nelms must plead a plausible claim that the County's physician policy was enacted and implemented "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Brawner*, 14 F.4th at 596. The Court finds that Nelms has not met this standard. Nelms does not allege facts showing that the County or policymaking officials knew and disregarded an obvious risk to Smith's constitutional rights by not staffing a full-time physician. *See Winkler*, 893 F.3d at 902 (citing *Free v. Granger*, 887 F.2d 1552, 1556 (11th Cir. 1989) ("It is not sufficient . . . to point to the absence of a medical doctor, or of a round-the-clock nurse, and decry the staffing policy is unconstitutional.")); *see also Wilber v. Cnty. of Jackson*, No. 13-cv-14524, 2016 WL 892800, at *10 (E.D. Mich. Mar. 9, 2016) ("Nor does he point to any evidence that Jackson County policymakers were even aware, much less accepted, that [ignoring prisoner medical requests] was a common practice" (citing *Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 630 (6th Cir. 2011)). There are no allegations that the County, in enacting a no-full-time-

13

physician policy, knew of any facts that would alert it to the risk the policy presented to Smith or even more generally, those with chronic conditions. The staffing matrix for the jail also shows that there is an LPN staffed at all times and a "H.S.A. RN" available for forty hours each week. (ECF No. 23, PageID.491.)[3] As discussed earlier, Nelms did point out other possible instances of inadequate medical care at the jail. But all of these instances are more than a decade old, and thus cannot show that the County is deliberately indifferent to constitutional violations caused by its *current* physician staffing policies. And Nelms did not allege that the current policies in place existed when the other alleged violations took place.

More specifically, Nelms argues that the Sixth Circuit affirmed a *Monell* claim on summary judgment against Lenawee County, which it argues shows its actual knowledge of the inadequacy of medical services at the jail. *See Smith v. County of Lenawee*, 505 F. App'x 526, 537 (6th Cir. 2012). It is true that the Sixth Circuit affirmed the district court's denial of summary judgment on a *Monell* claim against the County. But the plaintiff there alleged that the County failed to train its corrections officers yet relied on them to make medical assessments that were relayed to the jail's physician. *Id.* at 537–38. That is not the case here where the allegations show that the correctional officers relayed Smith's health concerns to medical personnel, and there is no allegation that the correctional officers were not trained

---

[3] The staffing matrix is part of the agreement between Lenawee County and Wellpath, attached to the County's motion to dismiss. (*See* ECF No. 23.) As the agreement was "referred to in the Complaint" and is "central to the claims contained therein," the Court may consider it at the motion-to-dismiss stage. *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

properly. And again, any findings about the County's medical inadequacies from that case were made in 2012, over eight years before this complaint was filed, and cannot show that the County has knowledge about an obvious *current* risk. Thus, the Court finds that it is not plausible that the County's policy of not providing full-time access to a physician amounts to deliberate indifference.

In sum, Nelms' complaint does not make it plausible to infer that in enacting official policies, including the County's primary reliance on LPNs at the Lenawee County Jail, that the County was indifferent to the serious medical needs of those at the jail as required by the Fourteenth Amendment. So Nelms' *Monell* theory based on official policies fails to state a claim for relief.

2.

And even assuming that Nelms has adequately pled that the County's official policies evidence deliberate indifference to the serious medical needs of those at the jail, Nelms' official-policy theory fails for a second, independent reason: Nelms cannot show that the injuries were incurred because of any of these policies.

To plausibly allege the necessary causal link between the County's official policies and the alleged deprivation of Smith's Fourteenth Amendment rights, Nelms must show that the County's "deliberate conduct" is the "moving force" behind the violation. *See Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). But Nelms does not provide any factual allegations that link the alleged County policies to the constitutional violation. Instead, Nelms makes the conclusory assertion that "the policies, procedures and practices of defendants

15

Lenawee County, Wellpath/CCS pertaining to medical care of inmates suffering medical emergencies . . . is constitutionally deficient and was the moving force behind the violation of plaintiff decedent's rights under the Eighth and Fourteenth Amendments[.]" (PageID.12.) But such conclusory statements must be ignored by this Court when deciding a motion to dismiss. *See Iqbal*, 556 U.S. at 663–64. This statement is also belied by the somewhat contrary assertion that Parker acted "contrary to . . . jail medical protocols," which suggests that perhaps the County's medical protocols were constitutionally-sound, but Parker did not comply with them. (PageID.11.)

However, Nelms also pleads a number of specific policies, so the Court looks at each policy and determines if it is plausible that it caused Smith's constitutional injury. After undertaking this analysis, the Court finds that none can be considered "the moving force" behind the injury.

As described earlier, Nelms alleges a few policies related to the County's reliance on LPNs, but none of these are adequately pled to be the "moving force" behind the alleged constitutional violation. The Sixth Circuit in *Graham* rejected the plaintiff's *Monell* claim, which was based on the defendant county's use of LPNs, because the allegations in the complaint "focus primarily upon the inadequacy of the medical treatment that was provided to Mr. Graham by SecureCare and its staff." *Graham*, 358 F.3d at 385. The *Graham* Court went on to find that even if the medical care Graham received amounted to a constitutional violation, the violation was not caused by a faulty County policy. *Id.* at 384.

16

Here, Nelms' factual allegations also focus on the inadequacy of the care Smith received, and not on a County policy. Nelms alleges that Parker failed to conduct an EKG (PageID.6), failed to obtain Smith's records from Veterans Affairs (*id.*), and failed to screen for coronary artery disease (PageID.7). Similarly, Nelms alleges that Miller refused to assess Smith when called by correctional officers (PageID.7–8), failed to take Smith's vital signs (PageID.8), and refused to provide oxygen, CPR, or other resuscitation efforts to Smith (PageID.9). None of these allegedly unconstitutional actions relate to any County policy described in Nelms' complaint. There are no allegations that these actions were not taken specifically because of a County policy either. Nelms also alleges that Miller did not contact a nurse supervisor, RN, or physician. (PageID.7.) This allegation could relate to the alleged County policy that there is no full-time physician or nurse supervisor for LPNs. But Nelms did not plead that Miller was unable to contact a physician, RN, or nurse supervisor because there was none staffed on the relevant night. Instead, the core of Nelms' claim is that Smith was provided with constitutionally deficient medical care at the hands of Miller and Parker. But as in *Graham*, this constitutional deficiency is attributable to factors other than the County policy, and therefore, cannot be the basis of a plausible *Monell* claim.

Nelms asserts that *Graham* can be distinguished from the present case because Nelms alleges multiple examples of healthcare failure, which points to a systemic failure. Nelms states that the *Graham* court focused on how the county had a sound policy of relying on SecureCare, but that individual SecureCare employees

17

negligently administered the sound policy. So Nelms' argument is that by alleging that multiple issues have arisen, the constitutional violation is not attributable to individual negligence, but County policy.

Nelms' attempt to distinguish *Graham* is unpersuasive. The Court cannot find that Nelms has plausibly alleged a systemic failure due to the County's medical policies when the only other incidents alleged are more than a decade old. Nelms also points to a memo written by former Jail Commander Dennis Steenrod regarding inadequate health care due to staffing issues as evidence of multiple issues with the jail's healthcare policies. (PageID.19.) But again, this memo was written almost 15 years ago. (*Id.*) And since then, the County has made at least one significant change to its healthcare administration by contracting with Wellpath. (*See* ECF No. 23, PageID.375 (showing contract between the County and Wellpath effective from January 2018 through December 2020).) Thus, these allegations do not plausibly show current systemic failure such that the County could be liable. At best, they may plausibly allege that the jail had systemic issues with healthcare in the past. But, at this point in time, and without more recent examples, the Court finds that *Graham* precludes Nelms' theory that the use of underqualified LPNs amounts to *Monell* liability for a Fourteenth Amendment violation.

Turning to the cost-related allegations, Nelms does not allege that any action leading up to Smith's death was taken specifically due to budgetary concerns. True, to some extent, almost every decision taken by a medical services provider in a jail (or perhaps in general) is in some way constrained by the budget. But if that were

18

enough to show that the County's policy is the "moving force" behind a constitutional violation, municipal entities would almost always be liable for constitutional violations regarding insufficient medical treatment. That is not the case, though. Nelms must provide more specific allegations directly linking the unconstitutional actions to the County's budget. *See Jones v. Muskegon Cnty.*, 625 F.3d 935, 946 (6th Cir. 2010) ("Liability may be imposed on a county only when a county 'policy' or 'custom' caused the plaintiff's injury and a 'direct causal link' existed between the policy and the purported denial of the right to adequate medical care."); *cf. Brawner*, 14 F. 4th at 600 (holding that the jail's ban on controlled substances and evidence that the abrupt discontinuation of Brawner's prescriptions caused her injury showed a direct causal link between the policy and injury). Because she has not, the budget-related policy claims also do not survive the motion to dismiss.

Nelms also did not plausibly plead that the lack of access to a full-time-physician policy was the "moving force" behind Smith's constitutional injury. As a reminder, Nelms needed to plausibly allege a "direct link" showing that "because" a physician was onsite at the jail only one-and-half to three hours a week, the County was deliberately indifferent to Smith's serious medical needs. But the facts Nelms alleges tell a different story. Specifically, she says that because of the decisions Miller and Parker made in their treatment of Smith, he was denied the healthcare he needed. It was not because Smith could not see a physician while he was in the facility that he suffered potential complications from his chronic conditions, but because he saw medical professionals who used allegedly constitutionally-flawed judgment in

treating him. Thus, the Court finds that Nelms has not adequately pled causation to proceed on a theory based on the lack of full-time physician access.

B.

Many of the alleged policy failures Nelms describes could also fall into another category of *Monell* claims that impose liability on municipalities for a custom of inaction.

But even construed as such, Nelms has not plead sufficient facts showing that the County had a custom of inaction. To prove such a claim, a plaintiff must plead a "clear and persistent" pattern of misconduct. *Nouri v. Cnty. of Oakland*, 615 F. App'x 291, 296 (6th Cir. 2015) (citing *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007)). But as the Sixth Circuit notes, such a pattern has never been found based solely on the mistreatment of one plaintiff. *Id.* And, as this Court has already discussed, the other alleged instances of mistreatment in the complaint are not sufficient to show a clear and persistent pattern of misconduct. Claims of unconstitutional behavior from more than a decade ago are not "persistent." Further, they are not similar enough to the facts of this case to constitute a pattern. Nelms has not alleged specific facts for many of the other incidents she alleges constitute the County's custom of mistreatment. (*See, e.g.*, PageID.18 ("That defendants Lenawee County and Wellpath/CCS, had specific knowledge of the inadequacy of the medical care provided inmates of the Lenawee County Jail as specifically set forth in the allegations of Yolanda Flores, who died in the care and custody of the Lenawee County Jail in December, 2006.").) And where Nelms has

20

specified the medical conditions and circumstances involved in a prior case of alleged mistreatment, they differ quite a bit from Smith's case. For example, the alleged unconstitutional incident involving Daniel Pederson consisted of an abdominal abscess, and the incident involving Aaron Borck involved acute appendicitis. By contrast, Smith suffered a heart attack, allegedly in part because he had a number of chronic conditions that were not properly treated. So even if the Court were inclined to treat these incidents as "persistent," Nelms still has not pled "any similar incidents." *See Nouri*, 615 F. App'x at 296. Thus, the claims against the County cannot survive on a theory of inaction either.

C.

Finally, Nelms has alleged that the County is liable based on a failure-to-train theory. Specifically, Nelms states that the County does not provide "LPN training programs regarding care and monitoring of patients with chronic conditions and special needs including hypertension and cardiovascular disease resulting in LPN assessment and treatment of patients outside of LPN scope of practice[.]" (PageID.16.) But such a claim could only proceed if the County employed the LPNs.

To show failure to train, a plaintiff "can show '[a] pattern of similar constitutional violations by untrained *employees*' and [the County's] 'continued adherence to an approach that [it] knows or should know has failed to prevent tortious conduct by *employees*[.]'" *Shadrick*, 805 F.3d at 739 (quoting *Connick v. Thompson,* 131 S.Ct. 1350, 1360 (2011)); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) ("Only where a municipality's failure to train its *employees* in a

21

relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." (emphasis added)). "Alternatively, [plaintiff] can establish a single violation of federal rights," but even that route requires "a showing that [the County] has failed to train its *employees* to handle recurring situations presenting an obvious potential for a constitutional violation." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). Here, Nelms cannot make either showing against the County because she has not pled that the County employs LPNs. Miller, the only LPN mentioned in the complaint, is employed by Wellpath. And Nelms has not pled any allegations that, if true, would allow her to show that the County failed to train its employees as her only failure to train allegation involves LPNs. As the County points out, the allegations that involve County employees show that the employees behaved appropriately and did not contribute to any constitutional violation.  Thus, the failure-to-train claim against the County is not plausibly pled.

The case law also overwhelmingly shows that failure-to-train claims are made against the entity that employs the individuals who were allegedly not trained. *See Shadrick*, 805 F.3d at 738 (considering a failure-to-train claim against a private medical provider and "its nurses"); *Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018) (considering a failure-to-train claim against county for not adequately training its jail personnel); *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (considering defendant's failure to train "her employees"); *Brown v. Shaner*,

22

172 F.3d 927, 930 (6th Cir. 1999) (considering city's failure to train "its officers"); *Smith v. Cnty. of Lenawee*, 505 F. App'x 526, 537 (6th Cir. 2012) (considering county's training of jail personnel); *Russo v. City of Cincinnati*, 953 F.3d 1036, 1045 (6th Cir. 1992) (considering city's failure to adequately train its police officers); *Jimenez v. Hopkins Cnty., Kentucky*, No. 4:11-cv-00033, 2014 WL 176578, at *17 (W.D. Ky. Jan. 13, 2014) (considering a failure-to-train claim against county for not training its deputy jailers).

The one case Nelms cites that involves a failure-to-supervise claim is *Kindoll v. Southern Health Partners*, No. 17-84-DLB-CJS, 2019 WL 1409842, at *11 (E.D. Ky. Mar. 28, 2019). Nelms uses *Kindoll* to show that failure to implement a quality assurance program and failure to supervise Wellpath's medical staff are actionable claims. But *Kindoll* involved a Department of Justice Proposed Resolution, signed by the county attorney, "which recognized improvements but also set forth a few areas of remaining concern regarding the County's provision of medical and mental health care which required future oversight by the DOJ." *Kindoll*, 2019 WL 1409842 at *7 (internal quotations omitted). Based on this agreement, the *Kindoll* court held that "Jailer Hankins knew that GCDC had not been found in compliance with the DOJ agreement, but he did not do anything to monitor the type of health care inmates were receiving at GCDC during the time SHP was the medical provider, such as implement a quality assurance program." *Id.* at *11. This is a significant difference from the case Nelms pled. There, the DOJ agreement essentially created a duty or an obligation on behalf of the county to ensure that its jail medical services were

improved after the DOJ made findings that they were inadequate. No such fact pattern has been alleged here, and thus, *Kindoll* cannot provide support for Nelms' failure-to-train LPNs claim.

The Court notes that it offers no opinion on Nelms' failure-to-train claim against Wellpath for not training LPNs. Wellpath has not moved to dismiss, and the Court does not consider the claims against it in this motion. The Court simply concludes that here, Nelms cannot plausibly plead a failure-to-train claim against the County by arguing it failed to train individuals not under its employ. Thus, Nelms' failure-to-train claim is also dismissed.

## V. Conclusion

Accordingly, the Court GRANTS the County's motion to dismiss and dismisses the County as a defendant. (ECF No. 23.) Count I will not be dismissed as to the other defendants.

SO ORDERED.

Dated: January 26, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

24