UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CHRISTINA NELMS,<br><br>        Plaintiff,<br><br>v.<br><br>WELLPATH, LLC f/k/a CORRECT<br>CARE SOLUTIONS, LLC,<br>DARYL PARKER, and<br>RHONDA MILLER,<br><br>        Defendants. | Case No. 21-10917<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING IN PART
MOTIONS TO SEAL [60, 64]**

Daniel Smith, Christina Nelms' father, was detained at Lenawee County Jail on August 31, 2018, following his arrest. Smith had a history of chronic medical conditions, like high blood pressure. And while he was at the Jail, Smith saw Rhonda Miller, LPN, and Daryl Parker, MD, two employees of Wellpath, LLC, for high blood pressure, chest pain, and shortness of breath. Unfortunately, two months after entering the Jail, Smith suffered a heart attack and passed away. Nelms, as Smith's personal representative, alleges that Wellpath, Miller, and Parker were deliberately indifferent to Smith's serious medical needs, leading to his death.

The parties recently disputed whether a portion of the morbidity review Wellpath conducted after Smith's death was privileged under federal law. As part of the briefing on that issue, each party filed documents that, per Defendants'

confidentiality designations under the parties' protective order, were to be filed under seal.

So the Court now considers these motions to seal. (ECF Nos. 60, 64.) For the reasons that follow, the Court finds that Defendants have sustained their burden of showing that the relevant Wellpath policies and its contract with the Center for Patient Safety should be sealed. But Defendants have not made a sufficient showing as to the Licensed Practical Nurse (LPN) job description and the staffing matrix. So the motions will be GRANTED IN PART.

I.

Defendants have moved to seal several of the documents filed in support of the briefing on the motion to compel.[1] In particular, Wellpath asks the Court to seal various policies that set out review procedures following an inmate death at the Lenawee County Jail, a contract it has with the Center for Patient Safety, a job description for its LPN position, and a staffing matrix for the Jail. (*See* ECF Nos. 63, 64.)

There is a longstanding and "'strong presumption in favor of openness' as to court records." *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 305 (6th Cir. 2016). Thus, a party that seeks to seal certain documents must meet a high burden, as only "the most compelling reasons . . . justify non-disclosure of [the]

---

[1] Though Nelms filed a motion to seal certain policies that were attached to her motion to compel (ECF No. 60), it appears that she does not believe that the documents meet the standard for sealing and filed the motion only to comply with the terms of the parties' protective order.

2

judicial records." *Id.* (internal citations omitted). If "the public interest in the litigation's subject matter" is great, then this burden only grows heavier. *Id.* And "even where a party can show a compelling reason why certain documents or portions thereof should be sealed, the seal itself must be narrowly tailored to serve that reason." *Id.* In other words, "[t]o meet this burden, the party must show three things: (1) a compelling interest in sealing the records; (2) that the interest in sealing outweighs the public's interest in accessing the records; and (3) that the request is narrowly tailored." *Kondash v. Kia Motors Am., Inc.*, 767 F. App'x 635, 637 (6th Cir. 2019).

## A. Wellpath policies

The Court starts by considering whether Wellpath's policies should be sealed. Though Defendants do engage in a "document by document" analysis of "the propriety of secrecy," *see Shane Grp., Inc.*, 825 F.3d at 305, their justification for sealing all five policies amounts to the following: "Allowing competing correctional health service providers access to this policy would harm CCS's competitive standing within the correctional healthcare business." (*See, e.g.*, ECF No. 63, PageID.1456.)

The Court agrees with Wellpath that there are compelling reasons to justify sealing the policies. The policies at issue lay out procedures for reviewing the deaths of incarcerated people in order to improve patient safety and quality of care. Indeed, each policy is related to Wellpath's continuous quality improvement program, as the "CQI" policy sets out. (ECF No. 63, PageID.1458.) Defendants maintain that the "Patient Death" policy "is intended to ensure that all deaths that occur at the

3

Lenawee County Jail are reviewed to determine the appropriateness of the clinical care[.]" (ECF No. 63, PageID.1456 (citing ECF No. 61, PageID.1375 (sealed)).) Similarly, the "Patient Safety Organization (PSO)" policy "outlines the procedure" by which Wellpath gathers information for patient safety organizations "to participate in quality and patient safety initiatives[.]" (ECF No. 64, PageID.1465.) And many of these policies overlap in this purpose of reviewing and improving patient care. For example, the "Critical Clinical Events" policy sets out how Wellpath responds to what it deems to be a "critical clinical event," and one such response could be conducting a morbidity review, which is established in the "Morbidity" policy.

Thus, as Wellpath argues, disclosure of these policies could "cause a competitive disadvantage." *See In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, No. 18-02818, 2023 WL 319922, at *3 (E.D. Mich. Jan. 19, 2023) ("As this Court, and other courts in this circuit, have held, parties have a compelling interest in sealing documents that 'might harm a litigant's competitive standing' and/or 'reveal internal strategy to a party's competitors.'" (citing *McClure v. Leafe*, No. 17-13106, 2019 WL 13201174, at *1 (E.D. Mich. Aug. 20, 2019))). These policies all reveal Wellpath's internal processes for improving the quality of patient care by reviewing critical health emergencies or patient deaths. Presumably, policies aimed at improving quality of care and patient safety are two ways in which Wellpath distinguishes its services from competitors in the prison-healthcare industry. Thus, because the policies would reveal Wellpath's strategy for improving patient safety,

4

which affects its competitive position, it has shown a compelling reason to justify sealing.

And though there is a presumption of openness to court records, the Court finds that the public interest in seeing these policies is minimal at this point in the litigation. The public can understand the nature of the discovery dispute and this Court's opinion on the matter without knowing the details of these policies. *See Wiggins v. Bank of Am., N.A.*, No. 2:19-CV-3223, 2020 WL 7056479, at *2 (S.D. Ohio Dec. 2, 2020) ("[T]he public can understand the nature of the discovery dispute at issue in Plaintiff's Motion to Compel without accessing the redacted information."). And these policies have relatively little to do with the alleged wrongful conduct, as they address procedures that occur *after* an incarcerated person has died, while Plaintiffs allege that Defendants acted unconstitutionally *before* Smith died.

The sealing is also narrowly tailored because the full content of these policies implicate the continuous quality improvement process. And the majority of each policy outlines specific steps that certain personnel are to take in response to certain events. So the Court finds that the request to seal these policies in their entirety is not overly broad.

In sum, the Wellpath policies at issue in this motion (ECF No. 61, PageID.1373–1396; ECF No. 65) will be sealed in their entirety.

### B. Wellpath's Contract with PSO

The same conclusion is warranted for Wellpath's contract with the Center for Patient Safety, a not-for-profit patient-safety organization.

5

Wellpath's contract with the Center for Patient Safety includes details about each organization's responsibilities in furtherance of improved patient safety and healthcare quality. The contract was created pursuant to the Patient Safety and Quality Improvement Act to establish a relationship that would result in the communication of privileged patient-safety work product as defined under the Act. (ECF No. 62-4, PageID.1446; ECF No. 65-2, PageID.1486 (sealed).) Given that the contract is part of Wellpath's strategy for improving patient care and quality, the Court finds that it implicates Wellpath's competitive position for the reasons just discussed. If disclosed, other providers in the industry could see exactly how Wellpath structures its patient-safety initiatives. So there is a compelling justification for sealing the contract.

And as explained above, it is not necessary to know the details of the contract between Wellpath and the Center for Patient Safety to understand the discovery dispute at hand, the underlying facts, or the Court's opinion on the dispute. And sealing the full document is narrowly-tailored to this purpose as the entire contract pertains to Wellpath's strategy for improving patient care.

Thus, the Court will also seal the contract between Wellpath and the Center for Patient Safety (ECF No. 65-2).

### C. LPN Job Description

Wellpath comes up short, however, in meeting its burden to justify sealing the job description for the LPN position.

Wellpath argues that the description is "proprietary in nature" as the description may include "additional responsibilities, qualifications and physical requirements that may not be part of a competing correctional healthcare provider's description for a nursing position." (ECF No. 63, PageID.1458.)

That may be true, but it does not show why Wellpath may be put at a competitive disadvantage by differing requirements. For instance, the job description does not contain salary or benefits information that would allow a candidate to directly compare the Wellpath position to another similar position. And many of the responsibilities described in the listing are generic, such as "[d]irect the work of employees[.]" Many others are common knowledge for an LPN position. That hardly amounts to "proprietary" information. Importantly, Wellpath has not asserted that this job description was kept confidential such that its competitors do not already have access to it. There has been no showing made that the job description is not already provided to potential candidates, and thus, has been revealed to members of the public. This further undermines Wellpath's purported competitive concerns if the information is already available to others in the industry. So Wellpath has not met its burden of showing that a compelling justification supports sealing the LPN job description.

As the first requirement for sealing is not met, *see Kondash*, 767 F. App'x at 637, the Court will not seal the LPN job description.

## D. Staffing Matrix

The Court also finds that Wellpath has not met its burden of showing that the staffing matrix should be sealed. The staffing matrix is a chart that lists the hours certain positions are staffed at the Lenawee County Jail during each shift.

Wellpath provides two justifications for why the staffing matrix should be sealed. First, it argues that "[t]he contents of the staffing matrix are determined by CCS for the purpose of ensuring there is sufficient staff to provide healthcare. Another competing correctional healthcare provider may have a lesser number of healthcare providers which would provide them with the internal strategy for CCS's staffing and provide a competitive advantage for the competition." (ECF No. 63, PageID.1459.)

But the Court fails to see why disclosing the number of hours certain healthcare providers staff the Lenawee County Jail in 2018 would affect Wellpath's competitive position in the industry. For one, the information in the matrix is from five years ago and reveals nothing about how Wellpath staffs the jail now. So even if a competitor were to see this information and somehow change its own strategy in response, it would be relying on information that is not current and that perhaps inaccurately reflects Wellpath's strategy today. Further, the matrix does not reveal how Wellpath decides the number of hours to provide staffing—it merely provides the end result of whatever strategic process Wellpath uses to determine its staffing. So it provides relatively little information for a competitor to use to its advantage.

Relatedly, in Wellpath's own words, the matrix is determined by Wellpath to ensure "sufficient staff to provide healthcare[.]" (ECF No. 63, PageID.1459.) So it's not clear that the matrix reflects a strategic decision rather than a decision based on the needs of a particular facility. And finally, as Nelms points out, this same matrix has been made publicly available on this very docket since June 28, 2021. (ECF No. 23, PageID.491.) Yet, it is only now that Wellpath seeks to have it sealed. So it seems unlikely that the information would truly cause a competitive disadvantage when it has been made public for quite some time without negative ramifications (as far as the Court has been made aware).

Wellpath's second justification is based on security concerns. "Allowing the public to know exactly how many individuals are present each day and each shift could potentially endanger the individuals by compromising the security at the jail." (ECF No. 63, PageID.1459.) But, again, the matrix reflects outdated information. And it has apparently not endangered the jail in the two years it has been publicly available. Further, healthcare providers are not in charge of securing the facility or even the medical ward. So the matrix does not implicate the same security concerns as the staffing hours for correctional officers, for example, would. In other words, it provides little information about the security of the jail.

So the Court finds that, on the specific facts here, the security concerns are not a compelling justification to seal the staffing matrix either.

## II.

For the foregoing reasons, the Court GRANTS Defendants' motion to seal (ECF No. 64) and GRANTS IN PART Nelms' motion to seal (as supported by Defendants' brief) (ECF Nos. 58, 62). The Wellpath policies (Patient Death, Morbidity, Critical Clinical Events, CQI, and Patient Safety Organization), (ECF No. 61, PageID.1373–1396; ECF No. 65), and the PSO contract, (ECF No. 65), will be sealed.

However, the Court may be willing to reconsider its decision to seal these documents if circumstances change. *See* E.D. Mich. LR 5.3(c); *see also Mitchell v. Tennessee*, No. 3:17-CV-00973, 2020 WL 6712169, at *1 (M.D. Tenn. Nov. 16, 2020) (vacating a prior order granting a motion to seal and noting that a district court has "inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment" (quoting *In re Saffady*, 524 F.3d 799, 803 (6th Cir. 2008))); *Evans v. Mallory*, 2009 WL 2900718, at *3 (refusing to seal prison surveillance video because it was "the centerpiece of [Defendant's] summary judgment motion," among other reasons).

The LPN job description and staffing matrix (ECF No. 58-4, PageID.1305–1308) will not be sealed. As the Court did not rely on these documents in its opinion on the motion to compel, no further action is required by the parties at this time. *See* E.D. Mich. LR 5.3(b)(C)(iii)(3).

SO ORDERED.

Dated: March 31, 2023

                                              s/Laurie J. Michelson
                                              LAURIE J. MICHELSON
                                              UNITED STATES DISTRICT JUDGE