UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CHRISTINA NELMS,<br><br>　　Plaintiff,<br><br>v.<br><br>WELLPATH, LLC f/k/a CORRECT<br>CARE SOLUTIONS, LLC,<br>DARYL PARKER, MD, and<br>RHONDA MILLER, LPN,<br><br>　　Defendants. | Case No. 21-10917<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER DENYING NELMS' MOTION TO COMPEL [58]**

Daniel Smith, Christina Nelms' father, was detained at Lenawee County Jail on August 31, 2018, following his arrest. Smith had a history of chronic medical conditions, like high blood pressure. And while he was at the Jail, Smith saw Rhonda Miller, LPN, and Daryl Parker, MD, two employees of Wellpath, LLC, for high blood pressure, chest pain, and shortness of breath. Unfortunately, two months after entering the Jail, Smith suffered a heart attack and passed away. Nelms, as Smith's personal representative, alleges that Wellpath, Miller, and Parker were deliberately indifferent to Smith's serious medical needs, leading to his death.

While conducting discovery, the parties find themselves at an impasse. Nelms requested that Wellpath produce the full Morbidity and Mortality Review it conducted following Smith's death. (ECF No. 58-1 (Nelms' request for production); ECF No. 58-2 (Wellpath's response).) Wellpath stated that it would provide Part I,

(ECF No. 69-4 (Patient Information Report)), and II, (ECF No. 69-6 (list of attendees at the Morbidity and Mortality Review meeting)), of the Review. But it said that Part III, the Report and Recommendations, was privileged. (*See* ECF Nos. 58-2, 62.) More specifically, Wellpath argues that the Patient Safety and Quality Improvement Act protects Part III because it is patient-safety work product as defined under the Act. (*Id.*) Nelms disagrees and contends that Wellpath has not met its burden of showing that the privilege applies.

The motion is now fully briefed, and given the adequate briefing, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

I.

Federal Rule of Civil Procedure 26(b)(1) provides that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" The only question at issue here is whether the discovery sought is nonprivileged—Wellpath does not assert that Part III of the Review is irrelevant or disproportionate to the needs of Nelms' case.

The privilege Wellpath asserts is established by the federal Patient Safety and Quality Improvement Act: "[P]atient safety work product shall be privileged and shall not be . . . subject to discovery in connection with a Federal . . . proceeding[.]" 42 U.S.C. § 299b-22(a)(2).

As relevant to the facts here, patient-safety work product is defined as "any data, reports, records, memoranda, analyses (such as root cause analyses), or written or oral statements . . . which . . . are assembled or developed by a provider for

2

reporting to a patient safety organization and are reported to a patient safety organization . . . and which could result in improved patient safety, health care quality, or health care outcomes[.]" 42 U.S.C. § 299b-21(7)(A)(i)(I). The Act clarifies that this definition "does not include information that is collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system." *Id.* at § 299b-21(7)(B)(ii). In turn, a patient safety evaluation system (PSES) is defined as "the collection, management, or analysis of information for reporting to or by a patient safety organization." *Id.* at § 299b-21(6).

Considering these provisions together, courts in this Circuit have identified two prongs for determining if the privilege applies: (1) the document is "created for the purpose of reporting to a patient safety organization" and (2) "is so reported." *Penman v. Correct Care Sols., LLC*, No. 5:18-CV-00058, 2020 WL 4253214, at *3 (W.D. Ky. July 24, 2020); *see also Tinal v. Norton Healthcare, Inc.*, No. 3:11-CV-596-S, 2014 WL 12581760, at *11 (W.D. Ky. July 15, 2014) ("[T]he question is whether the withheld documents contain patient safety information gathered as part of a PSES and reported by the provider to its PSO without being previously removed from the PSES or otherwise disclosed apart from the PSES.").

In support of the first prong—whether Part III contains patient safety information created for reporting to a patient safety organization—Wellpath provides the sworn affidavit of Dr. Judd Bazzel, who is the Patient Safety Officer at Wellpath. (ECF No. 62-4.) Bazzel explains that Wellpath established a contractual relationship with the Center for Patient Safety, a patient safety organization under the Act. (*Id.*

3

at PageID.1446.) This relationship was "for all purposes consistent with the Act, including, but not limited to, the protected exchange of patient safety and quality information in the conduct of patient safety activities[.]" (*Id.*) To collect, manage, and analyze "the information that may be reported to [the] Center for Patient Safety," Wellpath created and operated a patient safety evaluation system. (*Id.* at PageID.1447.) Wellpath's patient safety evaluation system "includes information that may result in documents such as . . . morbidity and mortality reviews[.]" (*Id.*) In this case, Bazzel states, "[f]ollowing Daniel Smith's death on October 29, 2018 . . . Wellpath quality improvement personnel held a meeting within the PSES with the intent to prepare a Mortality and Morbidity Report and Review to report to the Center for Patient Safety PSO[.]" (ECF No.62-4, PageID.1447.) Following the meeting, Part III was "assembled or developed by Wellpath with the exclusive intent to report to the Center for Patient Safety PSO[.]" (*Id.*)

Wellpath's "Patient Safety Organization" policy for the Lenawee County Jail corroborates Bazzel's affidavit. The policy includes morbidity and mortality reviews in its definition of patient-safety work product and defines patient-safety work product as being produced for the purpose of reporting to a PSO. (ECF No. 65-1, PageID.1477–1478 (sealed).) So Wellpath has shown that Part III of the Review was created as part of a patient safety evaluation system and with the intent that it would be submitted to a PSO.

And Bazzel also stated in his sworn affidavit that Part III of the Review "was reported to the Center for Patient Safety PSO on December 20, 2019[.]" (ECF No. 62-

4

4, PageID.1447.) So Wellpath has also satisfied the second prong—that the document was actually reported to a PSO.

Resisting these conclusions, Nelms argues that "Bazzel's affidavit is silent as to both personal knowledge of the facts asserted or even personal knowledge of the process and method of data reporting to the Patient Safety Organization (PSO)." (ECF No. 8, PageID.1547–1548.) But the Court interprets Bazzel's statement that he "under penalty of perjury and having been duly sworn, hereby swear[s] and affirm[s] the following" as affirmation of personal knowledge of the facts therein. (*See* ECF No. 62-4, PageID.1446.) And his role as Patient Safety Officer indicates he would have knowledge of these facts. Nothing Nelms provides indicates that this statement is insufficient for the Court to find that Bazzel has personal knowledge of the facts asserted in his affidavit, which include the purpose for which the Review was created and that it was reported to the Center for Patient Safety.

Nelms relies on another case from this District, *Herriges v. County of Macomb*, to argue that Bazzel's affidavit is not based on his personal knowledge. *See* No. 19-12193, 2020 WL 4726940 (E.D. Mich. Aug. 14, 2020). True, in *Herriges*, the court found that "Dr. Bazzel's lack of personal knowledge renders his testimony inadequate for sustaining CCS's burden of showing that the Reports were submitted to the PSO." *Id*. at *7.

That case differs from this one in several important ways, however. First, the court's conclusion that Bazzel lacked personal knowledge of certain facts was based on his testimony at an evidentiary hearing, and not on the affidavit submitted.

5

*Herriges*, 2020 WL 4726940, at *7 ("When asked about the fact that the documents showing in Exhibits D to H were in formats that did not comply with the instructions for electronic submission to the PSO, Dr. Bazzel testified, 'As far as the actual process that goes on when our administrative assistant reports the data to the PSO, I couldn't speak to the details of that.'"). Here, the Court neither has testimony that contradicts Bazzel's assertion of personal knowledge in his affidavit nor a request by either party for an evidentiary hearing. Further, as the *Herriges* court pointed out, there were several inconsistencies between the documentary evidence, Bazzel's affidavit, and the defendant's response brief in that case. *See* 2020 WL 4726940, at *4–8 (discussing how, among other things, Bazzel's testimony at the hearing was different from his affidavit and how defendant's response brief failed to account for certain reports that were at issue or contradicted the statements in Bazzel's affidavit). But Nelms points to no such discrepancies here that would cause the Court to doubt the veracity of Bazzel's affidavit. So the Court will not discount Bazzel's affidavit based on *Herriges*.

Nelms next attacks whether Part III "could result in improved patient safety, health care quality, or health care outcomes" in two ways. *See* 42 U.S.C. § 299b-21(7)(A)(i). First, Nelms points out that despite the Review meeting taking place on November 27, 2018 (about one month after Smith's death), Part III was not submitted to the PSO until almost 13 months later, on December 20, 2019. (*See* ECF No. 69-6 (listing date of meeting); ECF No. 62-4 (Bazzel's affidavit on submission to PSO).) Nelms argues that other courts have found that such a delay undermines whether the Review was truly created for patient-safety purposes. *See Herriges*, 2020 WL

6

4726940, at *6; *Dence v. Wellpath, LLC*, No. 1:20-CV-00671, 2022 WL 14469859, at *3 (D. Or. Oct. 25, 2022) ("Wellpath Defendants fail to explain how the mortality report, which Wellpath Defendants submitted to a patient safety organization sixteen months after Butterfield's death, was developed for the purpose of reporting to a patient safety organization.").

The Court acknowledges that the delay in reporting perhaps raises concerns about whether Wellpath is truly using these Reviews to improve patient safety. If one of the purposes of the PSQIA privilege is to encourage healthcare providers to freely exchange information with patient safety organizations in order to improve their services and obtain accountability, a long delay between the incident in question and its reporting would weaken the patient-safety rationale for the privilege. As the *Herriges* court put it, "the evidence that CCS so delayed submitting the Reports to the PSO weakens its post-hearing plea that compelling it to disclose the Reports would undermine its efforts to discuss how to improve the culture of safety." 2020 WL 4726940, at *6.

But the Court does not believe that a 13-month delay alone means that Part III of the Review does not contain "information that could result in improved patient safety[.]" Per Wellpath policy, morbidity reviews are conducted to establish best practices and to determine whether policies and procedures need improvement, and if so, in what ways. (*See* ECF No. 61, PageID.1382 (sealed).) The delay in producing the information to the Center for Patient Safety does not change whether such information is included in the Review and could serve its purpose of improving care

7

eventually. And as with the issue of personal knowledge, the facts in *Herriges* were more extreme than the facts here—there was more than a two-year delay between the creation of the reports and their submission to the PSO, and that delay suspiciously "coincided with this litigation." 2020 WL 4726940, at *6.

Second, Nelms argues that the fact that the analyses in Part III were conducted without interviewing the main personnel in charge of Smith's care—Parker and Miller—undermines whether they could actually result in improved patient safety. (ECF No. 69, PageID.1551.) As already noted, Wellpath may not be using best practices or at least, the practices that Nelms would find adequate. But the PSQIA does not contain such rigid requirements. And it is possible that Part III includes recommendations that could improve patient safety, even though the providers themselves were not part of the morbidity and mortality review meeting. As Nelms acknowledges, Miller is listed as a "person[] relevant to the incident," (ECF No. 69-4, PageID.1591), which could mean that someone spoke to her or obtained her notes or reports before conducting Part III of the analysis. And even if they did not, the Court finds that failure to include Miller and Parker in the meeting does not mean that the resulting analysis was devoid of information that could be used to improve health care outcomes. The law simply does not require the best or most-informed analyses for the privilege to apply.

Nelms also argues that Part III of the Review was not created for purposes of reporting to a PSO. Nelms reliance on *Dence* is unpersuasive, however. After establishing that the privilege does not apply to documents that "exist separately[]

8

from a patient safety evaluation system," the *Dence* court noted that Wellpath failed "to explain how the mortality report, which Wellpath Defendants submitted to a patient safety organization sixteen months after Butterfield's death, was developed for the purpose of reporting to a patient safety organization." 2022 WL 14469859, at *3. Thus, it appears the delay caused the court to doubt whether the report was created with the intent it be submitted to a PSO.

Here, Bazzel's affidavit alleviates any similar concerns. He described the relationship Wellpath has with the Center for Patient Safety and how the patient safety evaluation system typically included these mortality reviews. (ECF No. 62-4, PageID.1446.) And he explains how a meeting was called as part of this system with the intent to prepare a Review of Smith's death specifically for the Center for Patient Safety. (*Id.* at PageID.1447.) To the concerns of the *Dence* court, Bazzel explains that the delay was administrative, and confirms that despite the delay, "Part III at issue was maintained within Wellpath's PSES for reporting and was not used for any non-patient safety purpose[.]" (*Id.*) Further, in *Dence*, following in camera review, the court ultimately found the privilege did not apply because Wellpath used the same report to also fulfill its obligations to the county. No. 1:20-CV-00671, 2022 WL 17261990, at *3 (D. Or. Nov. 29, 2022), *reconsideration denied*, No. 1:20-CV-00671, 2023 WL 1802581 (D. Or. Jan. 10, 2023). Nelms does not provide similar evidence to this Court. So without other evidence suggesting an alternate purpose for the Review, the Court cannot find that the delay in reporting means that the Review was not created with the purpose of being submitted to a PSO.

9

Making a slightly different, but similar, point, Nelms argues that there was a dual purpose to the Review. (ECF No. 58, PageID.1267–1268.) Unlike other cases involving this issue, there is no evidence here that Wellpath created the Review to also fulfill non-PSQIA obligations. *See Dence*, 2022 WL 17261990, at *3 ("Because Wellpath Defendants used the review for the dual purpose of reporting to a PSO and meeting their contractual obligations with Josephine County, the M & M Report falls outside the scope of the PSQIA privilege."); *Penman v. Correct Care Sols., LLC*, No. 518CV00058, 2020 WL 4253214, at *4 (W.D. Ky. July 24, 2020) ("Ms. Saluga does not state . . . that the Report was assembled and developed for the sole purpose of reporting to a PSO. Further raising the specter that the Report may not be PSWP is the fact that the Report was produced by [Kentucky Department of Corrections]."). And Bazzel specifically stated that Part III "was neither created nor used to fulfill any external reporting (including any state or federal agency), recordkeeping, or record maintenance obligation. It was not publicly disclosed or reported, nor was it required to be publicly disclosed or reported, including to Lenawee County. Part III of the M&M Report was never provided to any external person or entity, other than the Center for Patient Safety PSO[.]" (ECF No. 62-4, PageID.1448.) So the Court finds that the Review was not created for a dual purpose such that it "exist[ed] separately" from the patient safety evaluation system.

The Court concludes by echoing an opinion in another case. Despite the "lingering concerns . . . about [Wellpath's] commitment to careful handling of patient

10

information," the evidence here "facially establishes the applicability of the PSQIA[.]" *See Louzi v. Fort Bend Cnty., Texas*, No. 4:18-CV-04821, 2021 WL 1751066, at *2 (S.D. Tex. May 3, 2021). So the Court will not compel Wellpath to produce Part III of the Review.

## II.

In sum, the Court finds that the PSQIA privilege applies to Part III of the morbidity and mortality review following Smith's death, and thus, Nelms' motion to compel is DENIED.

SO ORDERED.

Dated: March 31, 2023

                                                          s/Laurie J. Michelson
                                                          LAURIE J. MICHELSON
                                                          UNITED STATES DISTRICT JUDGE