UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINA NELMS, Personal Representative of the ESTATE OF DANIEL L. SMITH, Deceased,

Plaintiff,

v.

DARYL PARKER, MD, and RHONDA MILLER, LPN,

Defendants.

Case No. 21-10917
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO STRIKE [109] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [110]**

Daniel Smith had many chronic health conditions. Upon entering Lenawee County Jail, he began experiencing frequent chest pain too. He was repeatedly seen by medical staff and taken to a local hospital emergency room for his symptoms. Unfortunately, two months into his detention, and only two days after he returned from the hospital, Smith tragically passed away from a heart attack.

Christina Nelms, Smith's daughter and the personal representative of his estate, filed this lawsuit alleging that various medical providers at the Jail were deliberately indifferent to Smith's serious medical needs in violation of his constitutional rights. Several of those individuals have previously been dismissed from this case. The only remaining defendants are two providers from the jail's healthcare company: Rhonda Miller, LPN and Daryl Parker, MD.

Miller and Parker filed a motion to strike Nelms' forensic pathology expert report. (ECF No. 109.) They also filed a motion for summary judgment on all claims. (ECF No. 110.) Both matters are fully briefed and do not require further argument. *See* E.D. Mich. LR 7.1(f)(2).

For the reasons that follow, Defendants' motion to strike the expert report is DENIED and their motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

## I.

On August 31, 2018, Daniel Smith was arraigned on charges of contempt of court/failure to appear and booked into the Lenawee County Jail (LCJ) for pretrial detention. (ECF No. 110-4, PageID.3139.) A few days later, on September 5, 2018, Smith pled guilty to the charges and remained housed at LCJ awaiting his November 30, 2018, sentencing. (ECF No. 1, PageID.27); MiCourt Case Search, https://perma.cc/27LW-ZSY3 (Lenawee County Circuit Court indicating Smith's guilty plea on September 5, 2018).)

Smith's intake questionnaire at LCJ listed several health conditions, including hepatitis C, high blood pressure, and recent heroin use. (ECF No. 110-4, PageID.3131–3133.) He was placed on medical observation for heroin withdrawal. (*Id.* at PageID.3156.) Less than a week after entering LCJ, he began experiencing chest pain, which he reported to jail staff. (ECF No. 115-2, PageID.3683–3692.) From September 6 through 11, Nurse Rhonda Miller and other jail medical workers documented Smith's "constant chest pain," which he rated an 8/10 on the pain scale.

(*Id.*) On September 14, the jail doctor, Dr. Daryl Parker, met with Smith and placed him on medicine for hypertension. (*Id.* at PageID.3695–3696.) But the pain persisted. Smith was seen again on September 19 for chest pain, with a nurse noting the possibility of endocarditis, a bacterial infection. (*Id.* at PageID.3697.) Making matters worse, Smith was involved in an altercation at the jail during which he was punched in the ribs and began experiencing back and rib pain too. (*Id.* at PageID.3699; ECF No. 110-8, PageID.3293.) He had a chronic care visit with Dr. Parker on September 27, 2018, for "Blood Pressure/Hypertension/ Cardiovascular disease" but no changes were made to his treatment plan. (ECF No. 115-2, PageID.3698.)

That was until one month later, October 27, 2018, when he experienced 10/10 pain in his back, flank, and chest, and was sent to the emergency room at Promedica Bixby Hospital. (*Id.* at PageID.3707; ECF No. 110-8, PageID.3288–3289.) There, he was seen by an emergency medicine physician who conducted a physical exam, collected bloodwork, and reviewed X-ray and CT images. (ECF No. 110-8, PageID.3297.) The X-ray did not show any rib fractures. And the CT did not show any "acute process" (i.e. no signs of an urgent problem) in his abdomen or pelvis. (*Id.*) His cardiovascular and pulmonary exams also appeared normal. (*Id.* at PageID.3295.) But his bloodwork indicated hypokalemia (low potassium), so he was given an IV of potassium replacement. (*Id.*) With his potassium level improved and no other issues to treat, Smith was discharged and given a prescription for potassium tablets. (*Id.* at PageID.3295–3297; ECF No. 110-4, PageID.3213.)

The record does not reflect any progress notes or documented symptoms from October 28, Smith's first day back after the emergency room visit. (ECF No. 115-4, PageID.3712–3713.) But that changed the next day.

On October 29 at 4:27 p.m., Smith reported difficulty sitting up. (ECF No. 115-6, PageID.3716.) Nurse Miller was called but did not immediately respond. (*Id.*) Smith again reported his symptoms at 5:55 p.m. (*Id.*) Miller responded around 6:06/6:20 p.m., observing Smith with shortness of breath. (*Id.*; ECF No. 115-4, PageID.3713; ECF No. 115-17, PageID.4377.) She gave Smith an inhaler, prescribed to treat his COPD. (ECF No. 115-17, PageID.4377.) When Miller returned to Smith's cell around 7:50 p.m., she checked his vitals which all appeared to be normal, except for his oxygen saturation level. (ECF No. 115, PageID.3655.) This was at 93%, which Nelms' correctional nursing expert says is just below the normal 94% and up threshold. (ECF No. 115-11, PageID.4050–4051.) It seemed that his symptoms had improved. (ECF No. 115-4, PageID.3713; ECF No. 115-6, PageID.3716.)

At 8:58 p.m., Smith notified corrections officers that he may need help getting off the toilet. (ECF No. 115-6, PageID.3716.) A corrections officer relayed to Miller that Smith was feeling weak and unsteady. (ECF No. 115-5, PageID.3715.) Again, Miller did not immediately respond. At 10:56 p.m., Miller returned to find Smith experiencing difficulty breathing and sitting up. (*Id.*; ECF No. 115-17, PageID.4385.) When he was unable to answer questions and had alarming vitals, an ambulance was called. (ECF No. 115-4, PageID.3713; ECF No. 115-6, PageID.3716.) But Miller did not provide any oxygen or other treatment to Smith in the eight minutes they waited

for the ambulance to arrive. (ECF No. 115-6, PageID.3720; ECF No. 115-17, PageID.4389.) Smith coded in the ambulance and was pronounced dead at the hospital just before midnight. (ECF No. 115-6, PageID.3716; ECF No. 110-3, PageID.3106.)

Based on the autopsy reports, the parties do not dispute that Smith suffered from a bacterial infection at the time of his death. (ECF No. 110, PageID.3064.) But the experts have different opinions on the duration, signs, and effect of the bacterial infection on Smith.

The Lenawee County Medical Examiner, Dr. Bader Cassin, concluded that Smith's death was caused by "acute myocardial infarction (heart attack) resulting from advanced coronary artery disease." (ECF No. 115-18, PageID.4459.) And he considered "[h]epatisis C with cirrhosis, localized active right pleural infection, pulmonary emphysema and hypertension" to be contributing factors. (*Id.*) Smith's estate hired its own expert to conduct an autopsy, Dr. Werner Spitz. (*Id.*, at PageID.4464.) This doctor agreed that Smith died from "an acute myocardial infarction [heart attack] of 3 to 4 days [in] duration." (*Id.* at PageID.4467.) He noted the impact of Smith's chronic conditions. (*Id.* (identifying "[l]iver cirrhosis consistent with alcoholism and emphysema of the lungs[.]").)

Unfortunately, after submitting their respective reports, both experts passed away before their depositions could be taken. (ECF No. 109, PageID.2991.) The parties agreed that Dr. Werner Spitz's son, Dr. Daniel Spitz, would be substituted as an expert witness by reviewing all relevant records. (ECF No. 80 ("Stipulated Order

Substituting Daniel Spitz, MD, as Expert for Plaintiff for Werner Smitz, MD"); ECF No. 115-19, PageID.4495–4496.)

In his deposition, Dr. Daniel Spitz agreed that Smith died of a heart attack. But, unlike Dr. Cassin and Dr. Werner Spitz who attributed the heart attack to "a pure coronary artery narrowing," Dr. Daniel Spitz attributed it to a bacterial infection. (*Id.* at PageID.4505–4506 ("it look[ed] like an infectious etiology causing infarction in, in [sic] the heart in several areas. . . . this is an infectious etiology as a primary event with bacteria involving the kidney, the right pleural space [the right lung] as described by Dr. Cassin and in the heart.").) An expert retained by Defendants came to the same conclusion, stating that "more likely than not, [Smith] died of an overwhelming infection that involved multiple organs . . . those bacteria had to have gotten into the bloodstream and can cause . . . would have caused his final arrest." (ECF No. 110-9, PageID.3359–3360.)

An infectious disease expert hired by Nelms testified that Smith did not have clear clinical signs of bacterial infection. (ECF No. 115-20, PageID.4586 ("Q. Your conclusion in your report, the last paragraph about there being no clear evidence, you are referring specifically to no clear clinical signs or symptoms that he actually had an infection any time prior to his death? A. That's correct, yes.")).) But at least one of the nurses at the jail noted in Smith's chart that there was "concern for endocarditis." (ECF No. 115, PageID.3654 (citing ECF No. 115-13, PageID.4219).)

Smith's estate filed this lawsuit on April 23, 2021. (ECF No. 1.) The parties adjourned the scheduling order dates several times (*see* ECF Nos. 57, 74, 75, 76, 80,

87, 98, 107), and the case was stayed for a prolonged period due to Wellpath's bankruptcy (ECF No. 88, 90, 96). Several Defendants have been dismissed from the case. (*See* ECF No. 44 (declining supplemental jurisdiction over state law medical malpractice claims against Promedica Bixby Hospital and emergency medicine doctor); ECF No. 45 (granting Lenawee County's motion to dismiss); ECF No. 122 (granting Wellpath's motion to dismiss).)

Miller and Parker—the remaining Defendants—have now filed two motions: (1) a motion to strike Dr. Werner Spitz's autopsy report as inadmissible hearsay because he is not available to testify; and (2) a motion for summary judgment on all claims.

## II. Motion to Strike Expert

The Court starts with Defendants' motion to strike Dr. Werner Spitz's autopsy report as inadmissible hearsay (ECF No. 109). *See Pirata P.S.C., v. Bank of America*, No. 22-627, 2026 WL 2058957, at *3 (W.D. Ky. July 16, 2026) ("Because the admissibility of Plaintiff's expert witness testimony impacts the evidence available to the Court to consider in its ruling on Defendant's Motion for Summary Judgment, the Court will first resolve Defendant's Motion to Exclude [first].").

"Hearsay, defined as an out-of-court statement offered to prove the truth of the matter asserted, is inadmissible unless an exception applies." *Whiting v. Trew*, No. 22-5448, 2023 WL 5352133, at *6 (6th Cir. Aug. 21, 2023) (citing Fed. R. Evid. 801, 802). Federal Rule of Evidence 703 permits "a testifying expert to rely on materials,

including inadmissible hearsay, in forming the basis of his opinion." *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994).

If Nelms sought to publish Dr. Werner Spitz's expert report to the jury for the truth of the matter asserted, *i.e.*, to show Smith's cause of death, that would be inadmissible hearsay. Defendants, however, have no reason to believe that Nelms seeks to use it for that purpose. In substituting Dr. Daniel Spitz in as an expert after his father's death, the parties agreed that he "may rely upon both autopsy reports' narrative which set forth the observations and examinations performed on the body of Mr. Smith by both Dr. Werner Spitz and Dr. Bader Cassin." (ECF No. 80, PageID.1657.) But then, Daniel was to "offer his own opinions concerning the cause of death and opinions and conclusions concerning the slides that were obtained by Dr. Werner Spitz and Dr. Bader Cassin." (*Id.*) Dr. Daniel Spitz offered his own opinions during his deposition. (*See* ECF No. 115-19.)

There is no basis, therefore, to fully strike a report that the parties agreed should be considered. But its use is limited. Dr. Werner Spitz's opinions and conclusions are not admissible. However, Daniel Spitz can rely on the other aspects of Werner's report in providing his own expert opinion. Thus, Defendants' motion to strike (ECF No. 109) is DENIED.

## III. Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis added). A dispute is "genuine" if the evidence permits a reasonable fact-finder to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quoting Fed. R. Civ. P. 56(e)). So "[t]o survive summary judgment, the nonmoving party must present significant probative evidence putting the material facts in doubt." *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1057 (6th Cir. 2024) (internal quotation marks omitted).

## IV.

Nelms sues Nurse Miller and Doctor Parker under 42 U.S.C. § 1983 for violating Smith's constitutional rights. "To prevail on a cause of action under § 1983, a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Shadrick v. Hopkins County*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010)). The parties dispute only the first element: deprivation of a constitutional right. Nelms believes Smith was a

pretrial detainee and thus brings this claim under the Fourteenth Amendment. Defendants consider him a prisoner and argue the Eighth Amendment standards should apply. (*Compare* ECF No. 110, PageID.3046, *with* ECF No. 115, PageID.3659.) So the Court starts there.

### A. Prisoner or Pretrial Detainee

Both prisoners and pretrial detainees are constitutionally protected against deliberate indifference to their serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976); *Howell v. NaphCare, Inc.*, 67 F.4th 302, 310 (6th Cir. 2023). "While the Eighth Amendment's ban on 'cruel and unusual punishments' protects convicted prisoners, the Fourteenth Amendment's ban on 'depriv[ations]' of 'life' or 'liberty' 'without due process of law' protects pretrial detainees." *Hehrer v. County of Clinton*, 161 F.4th 955, 962 (6th Cir. 2025) (alteration in original) (quoting U.S. Const. amends. VIII, XIV, § 1). As the Sixth Circuit recently explained:

> "At one time, the distinction between pretrial detainees and convicted prisoners did not matter" . . . . *See* [*Hehrer*, 161 F.4th at 963]. To establish a constitutional violation, both sets of plaintiffs had to establish the same subjective and objective elements set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994). *Hehrer*, 161 F.4th at 963. "Objectively, they had to establish that they had serious medical needs." *Id.* (citation modified). "Subjectively, they had to establish that a defendant knew of the substantial risk of serious harm that arose from their serious medical needs." *Id.* (citation omitted). "And they had to show that the defendant did not respond reasonably to the risk upon learning of it." *Id.* (citation modified). In 2021, however, "we adopted an easier-to-meet subjective element for pretrial detainees" alleging deliberate indifference under the Fourteenth Amendment. *Id.* (citing *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021)). However, our court sitting en banc has now decided to reconsider the standards governing Fourteenth Amendment claims. *See Poynter ex rel. Fernandez v. Bennett*, 169 F.4th 716, 2026 WL 686194, at *1 (6th Cir. Mar. 11, 2026) (en banc) (order).

*Griswold v. Trinity Health Mich.*, 175 F.4th 706, 710 (6th Cir. 2026)

The Sixth Circuit's "decision to revisit those standards doesn't affect this case," *id.*, however, because while Smith may have entered LCJ as a pretrial detainee, at the time of the alleged constitutional violations he had already pled guilty. An individual's status converts from pretrial detainee to prisoner after "an adjudication of guilt in accordance with due process of law[,]". *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Smith pled guilty on September 5—just days after entering LCJ. (ECF No. 1, PageID.27); *MiCourt Case Search*, https://perma.cc/27LW-ZSY3. Thus, he was a prisoner, not a pretrial detainee, from that point on. *Alger v. Muskegon Cnty. Sheriff's Dep't*, No. 15-631, 2016 WL 11476899, at *4 (W.D. Mich. Aug. 3, 2016) (" . . . when the court accepted the plea, his status changed from a pretrial detainee to a convicted inmate awaiting sentencing."); *Hursley v. Corizon Health*, No. 21-1086, 2022 WL 557260, at *1 (W.D. Mich. Feb. 24, 2022) ("Due to Plaintiff's guilty plea, he is housed at the Calhoun County Correctional Center as a convicted prisoner, not a pretrial detainee."); *Davis v. Chorak*, 624 F. Supp. 3d 870, 879 (W.D. Mich. 2022) ("Although Davis alleges that he was a pretrial detainee at the time of the incident, the Registers of Actions in his criminal cases show that by the time of the July 2, 2020 assault, he had pled guilty in both cases.").

Accordingly, the Eighth Amendment governs Smith's deliberate indifference claim, not the Fourteenth Amendment.

### B. Eighth Amendment Deliberate Indifference

An Eighth Amendment deliberate indifference claim has both an objective and subjective prong. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Court addresses each, but there is no real dispute that this summary judgment motion focuses on the subjective prong.

#### 1. Objective Prong: Serious Medical Need

The objective prong requires the inmate to show that he had a sufficiently serious medical need. *Id.* "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004) (citation omitted).

Defendants do not dispute that Smith's bacterial infection constituted a serious medical need. (ECF No. 110, PageID.3064. ("It is undisputed in this case, as fully supported by the retained pathology experts for both Plaintiff and Defendants, that Smith developed [a] serious medical need involving an asymptomatic bacterial infection in his blood stream that travelled from his pleural space . . . to his lung, kidney, and heart").) Rather, Defendants only challenge their awareness of the infection for the purposes of prong two. (*Id.* at PageID.3065.) But even an undiagnosed medical need is objectively serious if it is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). So this claim survives to step two.

Apart from the endocarditis, Nelms points out that Smith had many other objectively serious medical needs —hypertension, COPD, and hepatitis C, and he was an IV-drug user and long-term smoker. *See Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017) (A "minor or non-obvious medical condition" can be objectively serious "if it is 'one that has been diagnosed by a physician as mandating treatment.'") Smith received treatment for these conditions at the jail during chronic care visits. (*See* ECF No. 115-2, PageID.3694.) Taken together, however, these conditions made Smith's risk of a heart attack greater. (*See* ECF No. 115-9, PageID.3876–3877 (Correctional medicine expert testimony that chest pain plus the chronic conditions in Smith's chart should have indicated to Dr. Parker that Smith needed further testing); ECF No. 115-2, PageID.3694; ECF No. 115-19, PageID.4500). Indeed, Defendants' own forensic pathology expert, Dr. Cassin, opined that many of these chronic conditions contributed to Smith's heart attack. (ECF No. 115-18, PageID.4459 (listing "[h]epatitis C with cirrhosis, localized active right pleural infection, pulmonary emphysema and hypertension" as contributing factors).)

"In light of [Smith's] allegations of pain and his ensuing heart attack[,]" and because this issue is not disputed, the Court finds "that Plaintiff's condition constituted a serious medical need." *See Seals v. Scutt*, No. 10-15054, 2016 U.S. Dist. LEXIS 152041, at *10 (E.D. Mich. Aug. 23, 2016) (finding allegations of chest pain and inability to stand without pain that then led to heart attack to be sufficiently serious medical need for deliberate indifference claim).

**2. Subjective Prong: Deliberately Indifferent**

Considering Smith's objectively serious medical needs, the next prong examines whether Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety" *i.e.*, whether each defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also dr[ew] the inference." *Farmer*, 511 U.S. at 837.

A medical professional's deliberate indifference requires a showing of something greater than negligence but less "than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895–96 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 835); *accord Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) ("Deliberate indifference . . . can be characterized as 'obduracy and wantonness' rather than 'inadvertence or error in good faith.'" (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991))). Where the plaintiff has received some medical care for his condition, he must show that the medical treatment was "so woefully inadequate as to amount to no treatment at all." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). The subjective component of a deliberate-indifference claim "must be addressed for each officer individually." *Rhinehart*, 894 F.3d at 743 (citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)).

**i. Doctor Parker**

The Court will start with Dr. Parker. He treated Smith for chest pain and chronic conditions on two occasions. (ECF No. 115-2, PageID.3695–3696 (detailing September 14, 2018 "Chronic Care visit for 'chest pain'" where Parker "ordered [an] increase [in] Lisinopril for 'Hypertension[.']"); *id.* at PageID.3698 (detailing September 27, 2018 "Chronic Care visit for 'Blood Pressure/Hypertension/Cardiovascular disease'").) When Smith's chest pain was severe, he was taken to the emergency room at a local hospital for evaluation. (ECF No. 115-2, PageID.3707.) They ran tests and conducted physical examinations and ultimately cleared Smith to return to LCJ. (ECF No. 110-4, PageID.3218–3232.)

Nevertheless, Nelms contends that Parker was deliberately indifferent because he "never evaluated Smith for either chest pain or endocarditis." (ECF No. 115, PageID.3666.) She points to Smith's complaints of chest pain on September 19, where a nurse noted that there was "concern for endocarditis" (*id.* at PageID.3654 (citing ECF No. 115-13, PageID.4219)), yet Smith was not evaluated by Parker for 8 days and, at that point, was seen for chronic care issues, like hypertension, not evaluated for endocarditis. (ECF No. 115-2, PageID.3698.) Nelms believes that without proper evaluation, Parker was unable to take the necessary steps such as sending Smith for "coronary artery disease screening" or "perform[ing] an EKG . . . ." (*Id.* at PageID.3668.)

While Parker did not conduct an EKG himself, when Smith reported experiencing 10/10 chest pain, Parker referred him to the emergency room for

evaluation. (ECF No. 110-4, PageID.3211.) "[I]mmediate referral to an outside hospital for treatment . . . does not demonstrate that [Dr. Parker] was deliberately indifferent to a substantial risk of harm." *Norman v. Mount Vernon Hosp.*, No. 17-9174, 2020 WL 4432063, at *8 (S.D.N.Y. July 31, 2020) (citing *James v. Gage*, No. 15-106, 2019 WL 1429520, at *14 (S.D.N.Y. Mar. 29, 2019)).

It is true that Parker did not evaluate Smith for or diagnose him with endocarditis. But "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). And experts dispute whether the clinical signs of endocarditis were present (ECF No. 115-20, PageID.4586) and whether that is what caused Smith's heart attack (*compare* ECF No. 115-18, PageID.4459, *with* ECF No. 115-19 (PageID.4495–4506)). Even the ER doctor who evaluated Smith two days before his death also failed to identify a bacterial infection. (ECF No. 110-4, PageID.3218–3232.)

This case is not dissimilar to *Sanderfer v. Nichols*, 62 F.3d 151 (6th Cir. 1995). There, plaintiff argued, much like here, that the jail's medical specialist:

> failed to review [the inmate's] medical history, failed to discover his hypertension, failed to recognize that he should have been examined by a cardiologist, failed to restrict his activities to those appropriate for someone with a heart condition, and prescribed inappropriate medication, and that as a direct result of this deliberate indifference to his medical needs, [the inmate] died [of a heart attack.]

*Id.* at 154. In reversing the district court's denial of qualified immunity, the Sixth Circuit held the defendant "obviously was not aware that [plaintiff] was at a substantial risk of heart failure" and "could not be 'deliberately indifferent' to this

risk when she made her diagnosis." *Id.* at 155. Because the record did not show defendant was aware "of facts from which she could and did draw the inference that her conduct posed a substantial risk of serious harm," summary judgment was appropriate. *Id.*; *see also Rosenblum v. Akanne*, No. 07-01176, 2009 WL 63771, at *4 (E.D. Ca. Jan. 8, 2009) (dismissing complaint for failure to state a claim under the Eighth Amendment where the plaintiff alleged that the defendants failed to test, diagnose, and send him to a cardiac specialist despite his heart palpitations, increased heart rate, irregular beats, and claim that chest pain caused irreparable damage to his heart where plaintiff was examined by defendants on several occasions in an attempt to treat his medical condition); *Herndon v. Sices*, No. 22-1179, 2022 U.S. App. LEXIS 26226, at *7 (6th Cir. Sept. 19, 2022) (dismissing a deliberate indifference claim where two medical specialists at the jail separately examined plaintiff after he had notified Health Care Services that he was experiencing "difficulty breathing, dizziness, and seizures" but failed to diagnose his blood clots because "[a]lthough [plaintiff] alleged that those examinations and diagnoses were inadequate and ineffective, he failed to allege facts showing that they were so ineffectual or insufficient 'as to shock the conscience or to be intolerable to fundamental fairness.'" (citation omitted).)

Similarly, even a misdiagnosis that resulted in inadequate treatment does not constitute deliberate indifference." *Wilson v. Bohjanen*, No. 14-11, 2015 WL 4904887, at *2 (W.D. Mich. Aug. 17, 2015) (citing *Gabehart v. Chapleau,* No. 96–5050, 1997 WL

160322, at *2 (6th Cir. Apr. 4, 1997). "This is so even if a misdiagnosis results in an inadequate course of treatment and considerable suffering." *Id.*

For example, in *Jones v. Muskegon County*, the prison doctor incorrectly diagnosed Jones' colorectal cancer as severe constipation. 625 F.3d 935, 946 (6th Cir. 2010). The Sixth Circuit affirmed the grant of summary judgment for the doctor, finding that "[e]ven though [the] initial diagnosis was incorrect, '[n]egligence in diagnosing a medical condition does not constitute unconstitutional deliberate indifference.'" *Id.* (quoting *Bertl v. City of Westland,* No. 07–2547, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009). So even if Parker missed that diagnosis, that does not constitute deliberate indifference.

Furthermore, Parker treated some of Smith's conditions. The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Frank v. Meden*, No. 20-00199, 2022 WL 4244487, at *9 (W.D. Mich. Aug. 2, 2022) *report and recommendation adopted*, No. 20-199, 2022 WL 3643737 (W.D. Mich. Aug. 24, 2022), *aff'd*, No. 22-1809, 2023 WL 6058862 (6th Cir. June 22, 2023) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* (collecting cases).

Parker did not "purposefully ignor[e] [Smith's] distress knowing that an adverse outcome [was] likely to occur." *Jones*, 625 F.3d at 945. Again, he evaluated Smith for chest pain and chronic conditions on two occasions, prescribed medications, and approved transfer to the hospital for treatment. (ECF No. 115-2, PageID.3695–3698; ECF No. 110-4, PageID.3211.) While Parker could have provided more attentive medical care by ordering more tests and screenings, the "treatment was not so woefully inadequate as to amount to no treatment at all" given Smith's condition at the times Parker saw him. *See, e.g.*, *Wilson v. Bohjanen*, No. 14-11, 2015 WL 4904887, at *2 (W.D. Mich. Aug. 17, 2015) (concluding prison doctor was not deliberately indifferent in prescribing medications, a TENS unit, and stretches instead of an MRI for severe, "deteriorating" back pain) (citing *Alspaugh v. McConnell,* 643 F.3d 162, 169 (6th Cir. 2011)).

Thus, Nelms has failed to show that Parker's actions constitute deliberate indifference.

**ii. Nurse Miller**

Nelms also argues that Nurse Miller was deliberately indifferent to Smith's serious medical needs on the day he died. Recall that on October 29, Smith was experiencing difficulty sitting up, shortness of breath, weakness, and abnormal oxygen levels. (ECF No. 115, PageID.3664.) In response, Miller provided Smith with an inhaler to help his breathing, but then left him alone for several hours until she charted the decline in his vitals and called for EMS. Nelms takes issue with these actions by Miller.

1.

First, Nelms points to Miller's "failure to contact the provider at any time before actually calling EMS." (*Id.* at PageID.3663–3664.) Miller contends she was simply making rounds during "routine medication pass time" and gave him his "as-needed inhaler" to alleviate what she thought were his COPD symptoms. (ECF No. 115-17, PageID.4377, 4384.) Nelms believes this was deliberate indifference because Miller is an LPN, and Wellpath's "own LPN job description" states that an LPN is "required to work under the direct supervision of registered nurses." (ECF No. 115, PageID.3656.) As such, she should not have provided the inhaler without consulting a supervisor.

Likewise, Nelms' correctional medicine expert, Dr. Donald Kern, testified that considering the drop in Smith's oxygen level to 93% and his medical history, Miller should have contacted a doctor at that time. (ECF No. 115-9, PageID.3902.) Nelms' correctional nursing expert, Renee Greengard, testified that Smith's symptoms demanded "immediate medical attention," and that Miller should have "called [a doctor or registered nurse] from the beginning to get a proper opinion on this and what should have been done." (ECF No. 115, PageID.3663–3665 ("Plaintiff's expert testimony establishes Nurse Miller's grossly inadequate care and denial of timely access to qualified medical judgment based upon multiple failures to contact the physician for orders over a six (6) hour period [on October 29] . . . .").)

True—calling a doctor typically insulates prison nurses from liability. *See Smith v. Campbell County, Kentucky*, No. 16-13, 2019 WL 1338895, at *17 (E.D. Ky.

Mar. 25, 2019) ("[when a] prisoner's medical condition appears serious, but less urgent, a nurse's timely examination and subsequent referral to a doctor is generally sufficient to avoid § 1983 liability."). But nurses can provide constitutionally adequate medical care on their own. *See Davis v. Caruso*, No. 07-11740, 2008 WL 4561659, at *21 (E.D. Mich. Oct. 10, 2008) ("To the extent plaintiff claims that [the nurse] did not have authority to diagnose his condition . . . , his claim does not survive summary judgment."); *see also Banks v. County of Allegheny*, 568 F. Supp. 2d 579, 597 (W.D. Pa. 2008) ("the Court addresses the claim that [respiratory care practitioner] was unqualified to treat Plaintiff because she 'is not a medical doctor.' The mere fact that she is not a doctor fails to state a claim of deliberate indifference as the Constitution does not mandate that inmates be seen and treated necessarily by doctors.").

This is so even if Miller deviated from Wellpath's internal policies. *See Meier v. County of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010) ("Flewelling did not comply with the departmental policy requiring that a subject with a [blood alcohol content] of .30 or above be transported to a medical facility. . . . Even if he was aware of the policy and failed to comply, his failure is not per se a constitutional violation."). Instead, Nelms must show that Miller knew of a substantial risk of serious harm" to Smith and "acted unreasonably in response to that risk." *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 485 (6th Cir. 2014). This she has not done.

Miller did not believe calling a doctor was necessary because she thought Smith's symptoms were from his already-diagnosed chronic conditions. (ECF No. 115-

17, PageID.4382.) In fact, she attributed his shortness of breath to his COPD. (*Id.* ("[H]e wasn't complaining of chest pain. His color was good. He had shortness of breath, which is normal with a COPD patient.").) And she treated him with an inhaler, which, at the time, she believed had worked effectively to improve his symptoms. (*Id.* ("That's why he had the order for the inhaler, which was effective.").) Once she realized Smith's vitals were concerning, an ambulance was immediately called. (ECF No. 115-4, PageID.3712.) So Miller's decision to address Smith's symptoms on her own, with already-prescribed medication instead of referring him to a more experienced medical professional, was reasonable, notwithstanding any violation of internal policy preferences.

This is reminiscent of the conduct of the nurse in *Winkler v. Madison County*, who thought the inmate's difficulty breathing, stomach pain, and vomiting (what turned out to be internal bleeding) were caused by his already-diagnosed opiate withdrawal. 893 F.3d at 893–94 ("In fact, Winkler does not dispute that Hacker's symptoms, as reported to Nurse Troutman, were consistent with opiate withdrawal."). There, the Sixth Circuit concluded that, even though the nurse's "assessment and treatment of Hacker might not represent the best of medical practices, her actions do not suggest deliberate indifference to a known risk to Hacker's health." *Id.* at 892. Same result in *Rouster v. County of Saginaw* where a prison nurse treated an inmate for alcohol withdrawal when, in reality, he was suffering from a perforated stomach ulcer. 749 F.3d 437 (6th Cir. 2014). The Court noted that if Jerry's "symptoms had been clearly inconsistent with alcohol

withdrawal, [the LPN] might have been deliberately indifferent by failing to confirm that his symptoms were not indicative of a different and more serious condition" *Id.* at 451. But since "the majority of [his] symptoms were entirely consistent with those experienced by patients suffering from alcohol withdrawal" the nurse's "conclusion that Jerry suffered from alcohol withdrawal was entirely reasonable" and did not constitute deliberate indifference. *Rouster*, 749 F.3d at 451–52; *but see Sours*, 593 F. App'x at 485 (finding fact issue on nurse's deliberate indifference when she was notified of inmate's insulin dependence and his symptoms indicated ketoacidosis, yet she failed to provide insulin).

Similarly here, Miller's inference that Smith's shortness of breath was due to COPD that could be alleviated with an inhaler does not reflect subjective awareness of a serious risk of harm, even if it turned out to be wrong. Smith had documented chronic conditions, and her decision to treat Smith with an inhaler comported with those diagnoses.

2.

Second, Nelms contends that Miller was deliberately indifferent by "fail[ing] to provide available oxygen" to Smith in the "eight minutes before EMS' arrival . . . ." (ECF No. 115, PageID.3664.) Earlier in the evening, a correctional officer advised Miller about Smith appearing weak and unsteady. But Miller did not check on him until two hours later. (*Id.* at PageID.3655.) At that point, Smith had dangerously low oxygen level and blood pressure. The estate's correctional medicine expert called the decision not to provide oxygen "grossly inadequate care" (ECF No. 115-9,

PageID.3957), and the correctional nursing expert called it "inexcusable" (ECF No. 115-11, PageID.4095). They testified to the importance of providing oxygen to a patient in Smith's circumstances. (ECF No. 115-9, PageID.3906 ("What's going on in a heart attack is the heart is not getting enough oxygen. That's why the heart muscle dies."); ECF No. 115-11, PageID.4096 ("Q. In this circumstance how would you describe that 8-minute interval of no oxygen under the circumstances? A. Well, that's critical."); *id.* ("he's got a blood pressure so low . . . If you don't have blood circulating, you don't have an oxygen saturation that you can read, you know, then seconds can cause . . . you are talking not a very long amount of time before you get brain death.").)[1]

Miller does not disagree. She knew Smith needed oxygen. (ECF No. 115-17, PageID.4394.) But she testified that she failed to provide it because doing so would have required her to either leave Smith alone with the corrections officer while she went to get it, or being left alone with Smith if she sent the corrections officer to get it . (*Id.* at PageID.4340, 4392, PageID.4389 ("Q. You didn't provide Mr. Smith with oxygen, although it was available, correct? A. It was available but not readily available and I chose to stay with the patient."); *id.* at PageID.4394 ("[t]he [corrections officer] that was with me would have been the one to go get it, and I can't

[1] Neither expert, however, opined that this eight-minute lack of oxygen caused Smith's death. (*Id.* at PageID.4032 ("I don't do causation."); ECF No. 115-9, PageID.3906 ("Q. Do you believe that had [Miller] administered oxygen at that time the patient would have survived? A. Probably not by – I'm not sure about by 22:53, no. He coded in the ambulance. It was only a matter of minutes. But she still should have done that.").)

be alone with a patient, so there was nobody to get it." (*Id.*) As Miller explained, neither option was desirable:

> [I]n a perfect world, I would have [provided Smith oxygen], but that would have meant me leaving the patient, and my experience and my beliefs is it's more important to stay with the patient, because if he had stopped breathing in my absence to obtain oxygen, there would have been no one to start CPR or use AED.

(*Id.* at PageID.4394.) And, again, it was against policy for the CO to leave Miller alone with Smith. (*Id.* at PageID.4418.)

The deliberate indifference standard recognizes the occasional tension between an individual's "responsibility of ensuring the safety of the prison staff" and the "obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Whitley v. Albers*, 475 U.S. 312, 320 (1986) (citing *Hudson v. Palmer,* 468 U.S. 517, 526–527 (1984)). Sometimes those interests "clash" such as when an inmate has a "history of sometimes violent non-compliance," or was "housed in the administrative segregation section of the unit" *Woolverton v. Livingston*, No. 15-314, 2018 WL 5885541, at *7 (N.D. Tex. June 20, 2018), or in the event of a prison riot*, see Whitley*, 475 U.S. at 320. In such a scenario, the Eighth Amendment considers that prison officials reasonably balance these competing interests. *Whitley*, 475 U.S. at 320.

Here, a reasonable jury could find that Miller got the balance wrong. Miller was not confronted with a prison riot or historically dangerous prisoner. To the contrary, Smith's vitals were so low he could not stand on his own. Miller was worried that he could need life-saving CPR at any minute. He was struggling to breathe and

close to death. But in lieu of taking some action to get oxygen, she waited for EMS to arrive. Taking all of this into consideration, a reasonable jury could find that Miller knew of and disregarded an excessive risk to Smith's health. In other words, there is a genuine issue of material fact on this deliberate indifference claim pertaining to Miller's decision not to administer oxygen to Smith while waiting for the ambulance. She is entitled to summary judgment as to her decision to treat Smith on her own earlier that day without calling a doctor or ambulance sooner.

**V.**

Accordingly, the Court DENIES Defendants' motion to strike (ECF No. 109), GRANTS Dr. Parker's motion for summary judgment, and DENIES Miller's motion for summary judgment with respect to that portion of Plaintiff's deliberate indifference claim the involves the failure to provide Smith with oxygen while waiting for the ambulance (ECF No. 110).

IT IS SO ORDERED.

Dated: August 12, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE